Next case is number 09-1393, photocure ASA v. Kappos, as the Director of the United States PTO. Mr. McIntosh, when you're ready. Good morning, Your Honor. May it please the Court. I'm Scott McIntosh. I'm with the Department of Justice. I'm here on behalf of the Patent Office. You may, we all may have a certain sense of déjà vu when I start talking about cases like Glaxo and Pfizer. The issue in this case, the statutory issue in this case, that determines the outcome of this appeal is the meaning of the definition of drug product in 35 U.S.C. 156F, and more particularly, the proper construction of active ingredient as used in that provision. Help us resolve the Glaxo-Pfizer interaction. Interaction, diplomatic way to put it. Let me start with Pfizer, the more recent case, and work back from there. As we understand Pfizer, it speaks directly to the question before the Court today. Pfizer directly addressed the meaning of active ingredient as defined in 156F. It adopted the FDA's interpretation of active ingredient in this textual context as meaning active moiety, and it applied that definition to determine that the product in that case was not the particular salt, but rather the parent acid and all of its salts and esters. To what extent can we rely on some of the reasoning of our presiding judge that that was in the context of an infringement case where the drug had undergone extensive FDA proceedings and an extension was warranted? Can we take that into consideration as we read the definition given of active ingredient in that particular case? And we have to recognize that case did not cite or refer to Glaxo at all. That is correct, Your Honor. As a textual matter, Your Honor... In other words, I'm asking you to look at that in its greater context and give me your feelings on it. I will, Your Honor, but the sort of jumping off point, I think, before you get too far off into the context of how one views that is the fact that there is a single definition of product, drug product, and the subsidiary pieces like active ingredient that governs throughout 156. So however one reads it in the context of 156, when it's applied or invoked in 156B for a question... But nowhere does that say active moiety in the statute. It says product. It says active ingredient in defining product. That's correct. The definition refers to active ingredient including any salt or ester of the active ingredient. When this court tried to unpack that language in Pfizer, it looked to the FDA's assessment for guidance and the FDA, unpacking essentially identical language in the context of marketing exclusivity in 21 U.C. 355, concluded that in that context active ingredient means active moiety. That when used as a freestanding concept elsewhere in the statute, it may have a different meaning. But then when we're talking about active ingredient and any salt or ester of the active ingredient, that that means that active ingredient in that context means active moiety. And it seems to me that one can't read active ingredient in that definition to mean two different things for purposes of 156A and 156B. And so that's why it seems to me that however one reads Pfizer, its approach to defining active ingredient has to govern the 156A patent term extension eligibility context as well. Doesn't that bring it into conflict with Glaxo? Well, that brings us to Glaxo. The basic difference in Glaxo from our perspective is that in Glaxo, the identity of the active ingredient in that case was undisputed, uncontested. As the case arrived here... That's true, but the dispute was not the identity of the active ingredient, but whether active ingredient as used in the statute means something more than just the drug, that maybe it means the active moiety. Well, I don't think that's quite the way the case was teed up. I mean, the FDA was... How is Glaxo different from this case? Factually, they're similar, Your Honor. Factually, they're similar. Doesn't that mean something to courts? Well, but the difference, Your Honor, is that this court has made clear that in order for a later panel to be precluded from addressing an issue by a prior panel's decision, that prior panel has to have addressed the issue explicitly. And when we look at Glaxo, when we look at how Glaxo came to the court and how this court addressed it, the parties were not in contention regarding the meaning of active ingredient. That wasn't a point of contention for the court. The position that PTO took in that case, in substance, was that the statute, the definition should be read to cover not only active ingredient in the narrower sense, and any salt arrestor, but some broader universe, even though it didn't fit within the text. Now, that's not an argument that active ingredient can be read, as we now argue, to mean active moiety. It simply took as a given that active ingredient meant something narrower and more specific. So this court never had to come to terms with the meaning of active ingredient. It wasn't, as I say, a point of contention in the case. But isn't it the same conclusion, though? I mean, it's like arguing that, well, no, we have to be concerned about the meaning of active ingredient. In this case, in Glaxo, the dispute was over the meaning of product, but product means active ingredient. Correct, Your Honor. But this court didn't have to come to terms in Glaxo and didn't, I think, come to terms in Glaxo with an argument that the language of the statute, as written, can, in fact, be read in a literal way to cover this kind of case. PTO is taking position there that, yes, we concede that this is not, that the drug, the second Glaxo drug, is not the same active ingredient, nor is it a salt or an ester that previously proved active ingredient. We concede all of them. Nevertheless, you should read the statute to bar the extension here. In other words, you should read the statute more broadly than active ingredient, that you should read it to mean active more widely. Well, no, you should read the statute to encompass more than active ingredient than salt and esters. That's not our position here. Our position here is that you should read it as written to cover active ingredient, salt and ester, but, and this is an argument that was not presented to the court because we weren't contesting it. We diverted you. Would you get to this case on its facts and tell us again the position of the office? The present case, yes. The office in this case has taken the same position which we understand this court to have taken in Pfizer and which the FDA has taken in construing the marketing exclusivity provisions, namely that to identify the product, you look, you interpret active ingredient to mean active more widely, and then you ask whether the active more widely or any salt or ester has previously been approved. Here, the active moiety of metvixia is ALA, the parent acid. It's formulated in metvixia as a particular salt and ester, MAL hydrochloride. But you're stating a premise that is disputed as to what the active component, the active, you're defining moiety in a way that answers the question. The real question is what is the active moiety in the case? Well, I'm not sure whether Your Honor is asking as a statutory matter or a matter of chemistry. I mean, as a statutory matter... Well, of course it's a matter of chemistry, isn't it? The statute is based on the chemistry. Well, that's correct, Your Honor, but let me just refer you to page 494 of the appendix, the joint appendix. This is from the patent application, the patent itself. And it describes the chemical process we're dealing with here. And it says, and I'm reading near the bottom of the page on the right, upon delivery to the desired site of action, hydrolytic enzymes such as esterases present in the target cells break down the esters into the parent ALA, which then enters into the heme synthesis pathway. So I don't think there's any dispute as a matter of chemistry that when we actually get into the site of action that the particular formulation that is in the pre-when-it's-applied, namely MAL hydrochloride, has been metabolized into the parent acid ALA, and it's that parent acid ALA that does the work, to put it colloquially. So the only question is a statutory question, namely, does that make... is that sufficient to deem this to be the same product as level, the previously approved product? And that turns on the question of whether active ingredient can fairly be read to mean active moiety in the sense that FDA has defined it, namely as the molecule that's responsible for the pharmacological and therapeutic action excluding the portions that make it a salt or ester. So on this theory, if one has FDA approval of the ALA, that's all you need? You could put all sorts of substituents on it without going through the process again? No, Your Honor. You would need... in terms of... from an FDA standpoint, in terms of filing an NDA or an ANDA, any change in... if you go from, say, a parent acid to an ester or from one ester to another or an ester to a salt, those would each require separate approval by the FDA. That's a separate regulatory matter. It doesn't drive... But that's what this whole statute is about, delay due to FDA approval. That's correct, Your Honor, but what Congress clearly did was draw a line and distinguish some... any time you have to go to the FDA and get approval for your drug, that's going to involve some measure of delay, potentially significant delay. If that were sufficient to justify, in Congress's mind, an extension, a patent term extension, then 156 would look, I think, more like 154, where you don't ask anything about the particular kind of patent, you just ask about the delay that's involved. Here, the provision that were... that drives this case, 156A5, says it's not enough that you've gone through this administrative process, it's not enough that there's been delay, and it's not enough that your drug is patentable. All those things are necessary, but in order to qualify for a patent term extension, you've got to show something more on top of all of that. What you've got to show is this particular... the drug you've got here has not previously been approved for marketing using the definition, the fairly broad definition, of product and drug product in the statute. So Congress was trying to distinguish between cases that warrant that kind of extension and cases that don't. And what I think we can tell from the text of the statute, if you treat this as an open question for the moment, is that Congress regarded the variations involved in salts and esters as not being significant enough to warrant patent term extension. And I think the primary virtue of the approach this court took in Pfizer that the FDA has taken, the PTO has taken here, is that it's true to that overall purpose. Whereas if you take the approach the district court took, and you take the approach that Fotocure is urging on, you wind up with highly arbitrary distinctions which essentially wind up giving extensions where Congress clearly couldn't have meant them. For example, you could have a situation where the FDA approves a particular salt of a parent acid. It then approves another salt of the acid. It then approves in another application an ester of the acid, and then another ester of the acid. In Fotocure's view of how the statute should work, the first salt, the second salt, the first ester, the second ester, any salt or ester, all of those constitute separate products. All of those are eligible for patent extensions. At that point, you're whittling this provision down to almost nothing. But if we look at the government policy on this, the PTO has been all over the place. How are we to draw any straight line on what the government really means by active ingredient through all of these various pronouncements? Well, I hope that we get assistance in drawing straight lines from this court. It is certainly true that there's been some uncertainty within the agency over time. That's been driven, obviously in part, prior to Pfizer by the influence of Glaxo, not just this court's opinion, which we don't think ultimately decided the question, but the district court's opinion, which did go further into the question of salts and esters. And obviously, it's the Eastern District of Virginia that has some influence on PTO's approach to these questions. But what we're here with today is, I think, a highly considered assessment, probably the most detailed assessment PTO has ever given to this question. It's informed by Pfizer. It's informed by the FDA's interpretation of the same language in the marketing exclusivity context. And I think, hopefully, we're in a position now where, if this court gives its imprimatur, we'll have a very clear administrable rule that we can go forward with. Okay. Let's hear from the other side, and you have some time left to rebuttal. Mr. Bateman. May it please the court. John Bateman for PhotoCure. In Glaxo, this court interpreted the exact same statutory language that's at issue here. Active ingredient of a new drug, including any salt or ester of the active ingredient, from 156F. In Glaxo, this court dealt with facts that are virtually indistinguishable from the facts here. In Glaxo, the PTO's position was virtually indistinguishable from its position here, and this court held, in Glaxo, that a patent term extension was permissible in that situation, applying the law to the facts. If Mr. McIntosh is correct, it's not that the parties were not contesting in that case that the ceparoxymaxotil was the active ingredient of ceftin, the product in question? That's correct, but the parties absolutely were contesting the construction of the term active ingredient of a new drug, including any salt or ester of the active ingredient, and its constituent terms, including active ingredient. So in that case, the whole dispute was over how do you interpret that phrase. Now... In that case, what interpretation did the court give to the expression active ingredient? Let's see, on... Let's see, on page... It says repeatedly that it has its plain meaning. On page 395, the court said that active ingredient, salt, and ester all had well-defined, ordinary, common meanings when Congress enacted the Act. Then it cites two Federal Register notices and a chemical dictionary, the Hawley's chemical dictionary. Now, the chemical dictionary includes definitions for salt and ester, so it's clear that the plain meaning, according to the court in Glaxo, of active ingredient, came from those two Federal Register notices. And when we look at those, in the first one, the 44 Fed Reg notice, it is stated that the same... I should emphasize, these are Federal Register notices that were in existence before adoption of Hatch-Waxman. And in the 44 Fed Reg notice, it is stated that the same therapeutic moiety may appear in slightly different chemical forms, e.g., as different salts or esters of the same molecule. To distinguish these separate forms, the term active drug ingredient is used. Each salt or ester of a therapeutic agent is a unique active drug ingredient. And the 45 Fed Reg notice is to the same point. So the Fed Reg notices are very clearly saying that each salt or ester of a therapeutic agent is a unique active drug ingredient. And then the court is saying, if we want to see the plain meaning of active ingredient, which we're adopting in Glaxo, we look to these Fed Reg notices. So the court, in that way, in Glaxo, very clearly stated that each salt or ester of a therapeutic agent is a unique active drug ingredient. Now, just one procedural point I want to raise. Just this morning, I noticed that the Joint Appendix, although we had cited these two Fed Reg notices and we had cited the portions of the appendix material that included them, I noticed that the Joint Appendix did not include the actual Fed Reg notices. And we were moving on an expedited schedule to catch up with the court, though, and I can understand how that could have happened. The patent office was preparing the Joint Appendix. Anyway, perhaps if the court will allow, we would like to submit those Fed Reg notices. I would think we could find them if we need them, but if you want to submit them, that's fine. The only reason I say that, I know from experience, that they're not, because they're fairly old, I think they're from 1979, they're not available readily like on Lexis. Well, if they're not, then please do submit them. We'll be glad to have them. Okay. So, now, in Glaxo, this court specifically rejected the patent office's argument that the key statutory language at issue here, active ingredient of a new drug, including any salt or ester of an active ingredient, means active moiety. In the case, and this is stated on page 394 of the Glaxo opinion, the court said that the PTO asserts that Congress intended the definition, and that's this key phrase, to mean any new chemical entity, i.e., new active moiety, which would encompass all acid, salt, or ester forms of a single therapeutically active substance, even if the drug before being administered contained only other substances. So, the Glaxo court is setting up the PTO's position as arguing an active moiety approach, it's very clearly stating it, and to us, that's completely indistinguishable from the position the PTO is taking here. The PTO here is saying that if you look at the key statutory language, it means active moiety, salt of an active moiety, ester of an active moiety. That's what's included. That's exactly what the court in Glaxo said the PTO was asserting in Glaxo. And of course, the court rejected that approach of the PTO in Glaxo on page 395. It says, The commissioner, however, suggests that Congress inartfully and awkwardly selected this combination of terms intending something other than their combined, common, and ordinary meanings. This approach is unpersuasive because it simply overlooks the legal consequence that ordinarily attaches whenever statutory language has a clear and plain meaning. Instead, the commissioner simply ignores the plain meaning of these terms and argues, as a totally unrelated question, that Congress intended a meaning contrary to the plain meaning. Now, why does the PTO say that Glaxo is not controlling here? A couple of reasons. One is this sentence in the Glaxo opinion that says, It is undisputed that sephiroxymaxotille is the active ingredient of sefton tablets. Okay? When the court said that, and this is clear from the opinion, it's clear from looking at the briefs, but when the court said that, it's not saying that it's undisputed how we should construe the term active ingredient in the statute in 156F. It's just saying that under the meaning of active ingredient, let's say outside the context of 156F, the active ingredient of sefton tablets is sephiroxymaxotille. And, frankly, the situation here is not much different. In the metvixia drug product, if you look at the same sort of sources that were looked at in Glaxo, the orange book listings, the prescribing information for the metvixia drug product, if we look and see what is listed as the active ingredient, it's MALHCL. It's the ester and the salt. The actual compound that's in the metvixia drug product, just like sephiroxymaxotille was the actual compound in the sefton tablets. And I don't think the PTO even disputes that using active ingredient as it's used outside of 156F, that the active ingredient in metvixia, in our product, is MALHCL. What the PTO is saying here, and what the PTO is saying in Glaxo, is that when you look at active ingredient within the context of 156F, it gets a special definition. So, even on that one point, we're not really any different than the situation in Glaxo. Now, another point about Glaxo that the PTO raised in its reply brief, and then raised just a few moments ago, is this argument that there's no explicit holding in Glaxo about what active ingredient means. As an initial matter, we totally disagree, for the reasons I just gave. Glaxo says, we think these terms all have a plain meaning. It cites the Fed Register notices. The Fed Register notices very clearly say each salt or ester of a single therapeutic agent are different active ingredients. In that way, we feel that the court in Glaxo did specifically define active ingredient. Now, but even... Oh, I just want to say this. In several different places, too, it's clear that the court in Glaxo was thinking of this whole idea that the context, that the including any salt or ester of the active ingredient language, it was thinking of the PTO's argument that that made a difference, that that meant active ingredient should have a different definition in 156F. On page 395, it says that the terms should be given their combined common and ordinary meanings. In other words, just put the individual plain meanings together and what you have is the meaning of the full statutory phrase. On page 399 in Glaxo, the court said, as we have already stated, section 156F2's operative terms individually and as combined in the full definition have a common and unambiguous meaning. So again, the court in Glaxo was thinking of the terms combined, whether that somehow gave active ingredient a special definition and rejecting that idea. On this idea that Glaxo can be disregarded because its holding was just implicit, Patnav cites a number of cases and these are very different than the kind of situation we're talking about in Glaxo. Just as an example, Union Elector, which seems to be the primary case relied on by the PTO for this point, this was a situation where this court in a prior case had considered whether certain assessments, EPAC assessments I believe, whether they violated the Equal Protection Clause and had found in the prior case that they didn't. I think at some point maybe in the grounds for appeal it wasn't totally clear to me, but at some point the challenger had also suggested that these assessments violated the Direct Tax Clause or Direct Tax Clauses of the Constitution. But in the opinion there's absolutely nothing about the Direct Tax Clauses issue. I searched electronically for Direct Tax. You don't see it in the Union Elector case. And so, then, I'm sorry, in the prior case that was being discussed in Union Elector, I guess the prior case was Maine Yankee, and what this court said in Union Elector was, look, we can't assume that the court in Maine Yankee somehow dealt with this Direct Tax issue. It didn't say word won about it in its opinion. Yeah, maybe that issue was lurking there and had been mentioned at some point. But the opinion deals with the Equal Protection Clause. It doesn't say anything about the Direct Tax issue. So we can't read this prior opinion in Maine Yankee to somehow be a ruling saying that the assessments satisfied or passed muster under the Direct Tax Clauses. And now sort of turning to our case, there's nothing like that. I mean, it's not like there's some whole other issue that the court in Glaxo used to reach its ruling that the patent term extension was permissible. It didn't even discuss sort of the language active ingredient including any salt or ester of the active ingredient. So this case is totally different than the line of cases that the patent office is relying on for that point. Now, on the issue of Glaxo versus Pfizer, look, I certainly can't and the reason I bring that up right now is because sort of the last thing that the patent office relies upon to say that Glaxo didn't deal with the meaning of active ingredient is that, well, the Pfizer court did address the meaning of active ingredient and boy, it couldn't have done so if it thought that the Glaxo case had itself addressed the meaning of active ingredient. Look, I can't presume to know obviously, Your Honor, Judge Newman knows much better than me what was you know, what the Pfizer court was thinking about Glaxo, but certainly there are other explanations to this than the Pfizer court thinking that Glaxo didn't address the issue that's on the table here. You can just say, well, these are two different Pfizer's addressing the rights derived provision, Glaxo's addressing the eligibility provision and they're different that way. I do just want to, I know I'm over my time, I want to very quickly make one fact here. What would you look at in 156B, the scope provision is distinguished from the eligibility provision in 156A, what would you look at that would allow that distinction? We made this point in our briefs, and this was one of the, I think this was the primary The limited to use language? Exactly. The 156B says the rights during the extended term shall be limited to the Use approved. Use approved for the product. Any use approved. Yeah, it doesn't say shall be limited to the approved product, it's to the use approved. So, non FDA approved uses are not covered during the extended period. Everything else is no limitation in 156B on the product itself. Any more questions? Okay, thank you Mr. Bateman. Thank you. Mr. McIntosh, can you address that distinction between A and B? Yes, Your Honor. B does speak about the actual language is that the rights derived from any patent I'm leaving out a few words, shall be limited to any use approved for the product. And as a consequence and I think this is the overwhelming sort of background assumption of the Court's opinion in Pfizer, to determine the scope of the rights derived you have to figure out what product you're talking about. And that's, I take it to be the reason why this Court in Pfizer went on and got such considerable length in figuring out what the deficient product is being ultimately the dispositive question there. If you look at the end of the Pfizer opinion, for example, we conclude that the extended term of the 909 patent covers amlodipine acid, amlodipine, that's the parent acid, and any salt or ester as provided by section 156F. The extension is not limited to the best laid salt of amlodipine. What the Court understood I think correctly, is that you have to know what product you're talking about to figure out what rights are being as this Court held, was the parent acid, the active moiety, and any of its salts or esters. I think in Pfizer, both salts have been approved. That's correct. One salt was approved, then another salt was approved. Which was, I think, may turn out to be a significant difference, but we'll figure out how these cases interact. I guess I'll let say on that, Your Honor, and obviously I'm talking to the author of the opinion, but the definitional provision is the same in both cases. This Court relied on the meaning of the definition of active ingredient and active moiety in the FDA's regulations in that case. I don't think as I understand the opinion that one can understand it as doing anything other than holding that active ingredient means active moiety for purposes of that definitional provision, and it applies to both cases. The only other point I'd make is this. We've had a lot of back and forth about Glaxo and Pfizer. The words are going to start falling off the page. You obviously will have formed your own opinions. I would just say this. It is easy to look at Pfizer and find in its pages and its words a holding about the meaning of active ingredient and a holding that active ingredient means moiety. It takes considerably more effort to read Glaxo and find a square holding on the meaning of going back and looking at 30-year-old Federal Register notices to try to divine what the Court may or may not have been talking about. You're in a very different universe and you're not really dealing with anything that I think can fairly be called a controlling holding anymore. And that's why we would regard it as between the two, Pfizer to be the one this Court should follow. Any more questions for Mr. McIntosh? Thank you, Mr. McIntosh and Mr. Bateman.